### McKEE et al. v. BRAZELL et al.

No. 12227—Opinion Filed April 1, 1924.

Rehearing Denied April 22, 1924.

1. **Corporations — Resulting Trust — Absence of Relation—Purchase of Property by President of Corporation.**

Where a corporation owning and operating oil and gas leases on productive oil land became involved in litigation with the lessors, and the stockholders and directors did not desire to purchase the interests of the lessors because of the uncertainty of their title, but believing it to the best interest of the corporation and its stockholders for some one friendly to the corporation to own the land and the royalty interest in his own right, and the president, by purchase, acquired such ownership of the royalty interests with the full knowledge and consent of the directors and stockholders, held, in such purchase he was not acting as agent for the corporation and will not be adjudged to be holding such title in trust for the corporation.

2. **Judgment Sustained.**

Record examined, and held, that the judgment was supported by the evidence.

(Syllabus by Ray, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Oklahoma County; Frank Matthews, Judge.

Action by A. E. McKee et al. against James Brazell et al. Judgment for defendants, and plaintiffs appeal. Affirmed.

Ross & Thurman, R. W. Stoutz, and E. D. Woodburn, for plaintiffs in error.

Stuart & Cruce, for defendants in error.

Opinion by RAY, C. This is a suit by minority stockholders of the Black Panther Oil & Gas Company against the directors

of that company, James Brazell, its president, and O. O. Owens, and J. Coody Johnson for an accounting of the money, credits, and assets of the company which had come into their hands, or that of James Brazell, president of that company, and for judgment in favor of the company against the directors for such sums as came into their hands, or any of them, and not used for the benefit of the company, and to have James Brazell, O. O. Owens, and J. Coody Johnson decreed to be trustees for the company holding the legal title to the land upon which the company has an oil and gas lease, and to account for such sums of money as they, or either of them, have received or may hereafter receive as royalty from the operation of the lease.

Plaintiffs contend that they are entitled to a decree declaring Brazell, Owens, and Johnson to be trustees for the Martha Jackson and all other purchased interests in the Barney Thlocco allotment, and in all royalties, past and future, on any one of five grounds, as follows:

"1. The officers and directors were in duty bound to buy for the company, rather than themselves; it was property necessary to the protection of the company title in the working interest and was bought as an incident thereto, and was useful in its business and pertained to the only property owned by the company, and it was manifestly to the company's interest to purchase immunity from paying royalty.

"2. In making the purchase from Martha Jackson as well as all others it was represented that he was buying for the Panther Company, and he should be held to that representation.

"3. Brazell used the means, knowledge and opportunity derived from his position with the company, and the very heavy credit and obligations of the company to effect the Martha Jackson purchase through the Interior Department, without which credit and obligations he could not have acquired it. * * *

"4. The contract concluded with the guardian of Martha Jackson under the authority of the Interior Department expressly declared that Thomas Kelly and the Black Panther Oil & Gas Company should succeed to the title and royalty of Martha Jackson. * * *

"5. The actual title to the allotment was not purchased from Martha Jackson, but was purchased by the company from others called outstanding claimants at very heavy expense and put in the name of Kelly and then in the name of Brazell, Owens, and Johnson ostensibly to support the Martha Jackson title. The preponderance of evidence and expert opinion, including the chief counsel for defense and the advisers of the Indian Department, was that Martha Jackson either had no title at all or had an unascertained fraction less than half. And Brazell so manipulated these purchases and the conveyances thereof that all titles became merged or confused, and even if he had acquired the title of Martha Jackson it has become lost by confusion analagous to the doctrine of confusion of goods."

The facts upon which these contentions are made are, briefly, these: Barney Thlocco, a Creek Indian, died in 1899 during a smallpox epidemic. After his death the land involved was allotted to him for the benefit of his heirs. In 1914, Martha Jackson, claiming title by representation, by her guardian, executed an oil and gas lease to J. Coody Johnson which was approved by the county court. Sabre Jackson, her father, claiming an interest in the allotment, also executed an oil and gas lease to J. Coody Johnson. Each lease provided for a one-eighth royalty. The Black Panther Oil & Gas Company, a corporation with a capital of the par value of $100,000, owned by approximately 300 stockholders, acquired the two leases by assignment. Development in that field being expensive the Black Panther Oil & Gas Company entered into a drilling contract with the Oklahoma Petroleum Company to drill four wells for a one-half interest in the two leases. The two wells first sunk developed about an 8,000 barrel daily production. As soon as it developed that the allotment was of great value the collateral heirs of Barney Thlocco appeared as claimants by inheritance, which resulted in a great deal of litigation. There appears to have been as many as 150 claimants, each claimant, or group of claimants, having different firms of attorneys representing them, and all of them making common cause against the claims of Sabre Jackson and Martha Jackson, who were not of blood kin to Barney Thlocco. Barney Thlocco had one son who died leaving a wife surviving him who afterward married Sabre Jackson, and Martha Jackson was the fruit of that marriage. One contention that was made against the claim of Sabre and Martha Jackson of heirship was that the son of Barney Thlocco, through whom they claim, died during the same smallpox epidemic, and before the death of Barney Thlocco. The government conceived the notion that Barney Thlocco had died before April 1, 1899, and commenced suit in the federal court to cancel the allotment which was finally decided against the government by the Supreme Court of the United States. Pending litigation in the federal court a receiver was appointed to collect and hold the royalty. Pending the determination of the rightful

owner of the allotment, in order to prevent loss by drainage by adjoining development, the receiver was directed to execute a lease to the Black Panther Oil & Gas Company effective pending the litigation, and also instructed to collect and hold the two royalties of 25 per cent. of the gross production. Because of the great number of claimants and lawyers interested, the unsettled questions of law involved, the long time that had elapsed since the death of Barney Thlocco, and the uncertainty of proofs as to heirship, the title of Martha Jackson and Sabre Jackson, through whom the Black Panther Oil & Gas Company derived its working interest, appeared to the stockholders and officers of that company to be uncertain. The company, to make sure of its working interest, sought to buy out, or compromise, those claimants considered most dangerous to its interest, and did settle with one group of claimants for 10 per cent. of the gross production. In 1916, while litigation was still pending involving the title of Sabre and Martha Jackson, Brazell, president of the Black Panther Oil & Gas Company, conceived the notion that it might prove a paying investment to buy the title from Sabre and Martha Jackson. On advice of counsel he submitted the matter to the directors and stockholders of his company. After a general discussion of the matter in directors meeting and among the stockholders generally, it was decided that the company would not hazard the investment, but generally agreed that it would be to the advantage of the company if someone friendly to the company owned the land. General consent was given for Brazell to buy the land if he could. He and associates then bought Sabre Jackson's interest in the land, generally conceded to have been a courtesy interest, for $10,000, Brazell taking a two-thirds and his associates a one-third interest. Later, in the same year, he bought Martha Jackson's title from her guardian, which was approved by the county court having jurisdiction, for a consideration of $12,000 cash and a portion of the accumulated royalty to be not less than $25,-000. The United States probate attorney, being dissatisfied with the sale, appealed the case to the district court where it was pending at the time the stockholders and directors of the Black Panther Oil & Gas Company, in the beginning of the year 1918, decided it would be to the advantage of the company to buy out all opposing claimants and the Sabre Jackson interest and put the title in Martha Jackson or her grantee. At a stockholders meeting on the 4th day of February, 1918, at which a large majority of the stockholders were present either in person or by proxy, representing 88 per cent.

of the capital stock, after a general discussion of the situation, a resolution was adopted authorizing and directing the officers and directors to take the necessary steps to that end. Pursuant to that resolution the board of directors designated certain of its members to open negotiations with the claimants and contract for their interest subject to the approval of the board of directors. They bought all the opposing claims deemed dangerous, and acquired the Sabre Jackson interest by paying to Brazell the amount he had expended in acquiring that interest and paying his associates $20,-000 for their one-third interest, and undertaking certain obligations in connection with the Martha Jackson interest. In perfecting the Martha Jackson title in Brazell, the Secretary of the Interior required the payment to her of the accumulated royalty of her interest up to a fixed day, amounting in all to about $300,000. At the time of these transactions the money arising from the royalties was impounded in the hands of the receiver to be paid to the person or persons finally adjudged entitled to it. It was deemed necessary for the Black Panther Oil & Gas Company to advance the sums necessary to the expenses of the negotiations and settlements, except that of the Martha Jackson claim, which it did to the extent of something like $200,000. The advantage sought to be gained by the company, and which it is claimed was gained, was the elimination of the royalty under the Sabre Jackson lease so that thereafter there would be but one royalty to pay instead of two royalties. Whatever advantage was gained and whatever expenditures made and liabilities assumed were to be shared by the drilling company who owned a one-half interest in both leases.

A number of irregularities on the part of the officers of the Black Panther Oil & Gas Company in these various complicated transactions are pointed out, but no fraud of any kind or character is made to appear. It is pointed out that a great number of transactions agreed upon were not entered of record on the minutes of the company, and that at the meeting of the board of directors at which they decided by resolution to carry out the instructions of the stockholders, only six of the nine directors were present and that two of those directors, the president and one of his associates, were interested and not entitled to vote upon the proposition, and that the four directors present and voting to authorize the purchase of adverse claims and the Sabre Jackson interest did not constitute a quorum. It is also pointed out that in the negotiations and settlement with the In-

terior Department in perfecting in Brazell the title of Martha Jackson. that Brazell, as president, in his letters to the Department and its officials, wrote in the name of the Black Panther Oil & Gas Company, and that the Black Panther Oil & Gas Company made a bond guaranteeing certain payments. Upon that ground it is contended that in acquiring that interest the credit and resources of the Black Panther Oil & Gas Company were used to the extent that it must be held that in these transactions he was acting as trustee for the company and must be so adjudged. We do not think so. Acquiring the fee, by the president of the company, to the land upon which the company had a lease and for which it was paying a royalty to the owner of the land was not the acquiring of an interest adverse to the interest of the company. It was made with the full knowledge and consent of all the officers, directors. and stockholders of the company, and by them at the time believed to be to the company's interest. They deemed it to be to the company's interest for the reason that at all times both Sabre Jackson and Martha Jackson had been claiming that they had been overreached in making the leases and at different times, and on advice of different lawyers, had taken court action believed by the officers, directors, and stockholders to be inimical to the interest of that company. They believed that by securing these titles to the company, or to parties interested in the company, embarrassment, annoyance, and uncertainty would be eliminated. The correspondence by Brazell with the Department of Interior in the name of the company. by which the company agreed to assume certain obligations, and the execution of the bond to the Department to carry out those obligations, occurred some months after the stockholders had directed the directors and officers to make the settlement, and after the whole policy had been decided upon by the directors of the company, and were done for the purpose of carrying out these directions and instructions. It is contended that in making these various settlements in which Brazell and his associates were exceedingly active, the company paid to them, as expenses and for sums agreed to be paid by them in buying the interest of the adverse claimants, sums largely in excess of the amounts actually expended by them or agreed to be expended. There is not a word of evidence within the record that justifies this contention. There is no evidence whatever of fraud in any particular. All the transactions were without concealment and had the approval of the directors and stockholders of the company. At the

stockholders meeting in February, 1918, by a unanimous vote of the stockholders, the officers and directors were instructed to undertake to do what they did. At that meeting all of these plaintiffs were present by proxy and these proxies, or any of them, were not held by Brazell or any of his associates in the purchase of the Martha and Sabre Jackson interests. In the brief and oral argument of the plaintiff in error the ability and good faith of the directors and all others connected with the transaction are conceded except that of Brazell and J. Coody Johnson. It is contended that Brazell and J. Coody Johnson, by false representation, overreached the directors and stockholders by reason of the inability of the directors and stockholders to understand the intricacies of the transactions involved. We are unable to understand how this contention could be made with sincerity. The larger stockholders are conceded to be men of business experience who have proven their ability to take care of their own interests in ordinary circumstances. They were bankers, business men, oil men at the head of other oil companies, farmers, and at least one lawyer of well known ability and integrity, all of whom would derive great profit by the plaintiffs' prevailing in this action if these and other contentions of the plaintiffs should be sustained. All of them are satisfied with the entire transaction as made to appear by the evidence of a great number of them. The record shows that this suit was first conceived by the head of a detective agency, and that he sent a representative of that agency out over the country to see and interview the stockholders to get them to join in this action; that he employed a lawyer who circularized the stockholders in which he pointed out that the stockholders had been defrauded of hundreds of thousands of dollars by the unfaithful and fraudulent transaction of the officers of the company. The lawyer likewise traveled over the country to see the stockholders, and after all that effort succeeded in getting six stockholders, all non-residents of this state, who altogether owned about 700 shares of the par value of $700 to authorize them to bring this action or take steps to collect the money for them for an agreed fee of 10 per cent. of the amount recovered. It is one of the complaints running though the 350 page brief of the plaintiffs in error that all the stockholders except the six plaintiffs are in opposition to them and favor the defendants in this case. Three of the six minor stockholders whom they represent testified by deposition that they were satisfied with the management of the company and that they did not desire this suit pros-

ecuted. While many irregularities in the proceeding of the board of directors have been pointed out, attention has not been called to a single transaction that has the appearance of fraud, misconduct, or bad motive on the part of any of the officers, directors, or other parties who have taken a part in these various complicated transactions. It might reasonably be said that in entering upon a campaign to buy out opposing claimants and to secure whatever title Sabre Jackson had in the lease, they were entering upon a hazardous venture, but it is agreed that by that venture the stockholders of the company profited to the extent of 100 per cent. of the par value of the stock. A great point is made by the plaintiffs of the fact that Brazell, in buying the Sabre and Martha Jackson interest, took the title first in the name of a man who had no connection with the company, and no financial standing, referred to as the dummy, but in the light of all the transactions we see nothing in it to condemn. The object in having it conveyed first to an unknown party was to conceal from opposing claimants, and attorneys representing them, that the company or any one connected with it was buying up the opposing interests. We find nothing in the transaction of the officers and directors of the company to merit adverse criticism.

This case was tried by one of the ablest trial judges of the state, generally recognized for his ability to discover a fraud where there is a fraud. He found generally for the defendants and we think that is the only conclusion that can be reached upon the evidence adduced at the trial

The judgment should be affirmed.

By the Court: It is so ordered.